**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | |
| | : | **Case No. 25-CR-217** |
| **WILLIE SPEAKS** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### <u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia (the "Government"), respectfully submits this Memorandum in Aid of Sentencing.    On March 17, 2026, Defendant Willie Speaks pleaded guilty to Count 1 of the Indictment, which charged him with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).   Pursuant to the plea agreement, the Government agreed to dismiss the remaining counts of the indictment and cap its allocution at the bottom of the sentencing guidelines.

Defendant's conduct demonstrated a blatant disregard for the law and the safety of the community.   While illegally armed, Defendant fled from the police—placing the officers, but particularly the nearby residents, directly in harm's way—before discarding his loaded gun in someone's front yard.   Defendant committed this conduct while on probation, reflecting a continued unwillingness to comply with court-imposed conditions and the law.   For these reasons, and those reasons detailed below, the Government respectfully recommends a sentence at the bottom of the applicable Guideline range: 30 months of incarceration,

1

followed by 3 years of supervised release.   This sentence adequately reflects the seriousness of the offense, promotes respect for the law, protects the public, and delivers a just punishment for his conduct.

## FACTUAL AND PROCEDURAL BACKGROUND

On Sunday, July 20, 2025, a little before 2:00 AM, officers of the Metropolitan Police Department ("MPD") were conducting a routine patrol in the 600 block of Q Street NW when they observed two subjects, one of whom was later identified as Defendant Willie Speaks, peering into unoccupied vehicles.   When MPD officers stopped their marked police cruiser and attempted to make contact with the two subjects, they both started to flee on foot.   Officers observed Defendant running westbound in the 600 Block of Q Street NW and turning southbound on to the 1500 Block of 7th Street NW.   Defendant was successfully stopped less than a minute later around the corner in front of 1541 7th Street NW.   At the time he was stopped, Defendant had a cross-body bag draped around his body.

Officers canvassed the area and located the second subject, who had been fleeing on foot on 6th Street NW.   Upon an officer getting close to him, the second subject ran into the alleyway between 1500 6th Street NW and 1500 Marion Street NW, at which point he was stopped successfully in front of 1532 Marion Street NW.

Upon canvassing Defendant's flight path, officers located a handgun in the front of the residence of 634 Q Street NW.   Officers interviewed the homeowner of 634 Q Street NW and were able to retrieve home surveillance video footage, which revealed Defendant discarding the handgun in that location as he was fleeing on foot from the officers.   More specifically, the home surveillance video footage showed two subjects running down Q Street NW, one of whom had a

cross-body bag and one of whom did not appear to have any bags.   The subject without any bags appeared to bend down by the sidewalk as a metallic "clink" sound—consistent with discarding a firearm under a parked car—could be heard on the home surveillance video.   Additionally, the subject with the cross-body bag, whose clothing was consistent with Defendant's clothing when he was stopped within a minute later, reached into the cross-body bag and tossed an item in front of 634 Q Street NW, which is the location at which officers ultimately recovered the handgun. Below are screenshots of that home surveillance video footage, with Defendant circled in red and the red "X" marking the approximate location at which the handgun was ultimately recovered.





Additionally, below is screenshot from the body-worn camera of MPD Officer Barber, who found the handgun in that approximate area.



The recovered handgun was a .45 caliber P80 Ghost Gun, with no serial number. It was loaded with one round of ammunition in the chamber and nine rounds of ammunition in a magazine that was capable of holding thirteen rounds.

Officers confirmed that Defendant did not have a valid license to carry a pistol or possess ammunition in the District of Columbia. Additionally, it is not possible to register this particular handgun in the District of Columbia because it does not have a serial number.

At the time of this offense, Defendant previously had been convicted of a crime punishable by a term of incarceration greater than one year. More specifically, on November 22, 2024, Defendant was convicted of Loaded Handgun on Person in Maryland Case No. C-16-CR-23-003008. He was sentenced to 3 years of incarceration, all but 169 days of which was suspended. He was also sentenced to three years of supervised probation, which was set to expire in November

2027.

Defendant was charged initially with Carrying a Pistol Without a License, in violation of D.C. Code § 22-4504(a)(1), and Possession of a Prohibited Weapon (Ghost Gun), in violation of D.C. Code § 22-4514(c)(1) in D.C. Superior Court Case No. 2025 CF2 008332.

On July 24, 2025, the U.S. District Court for the District of Columbia approved a criminal complaint, charging Defendant with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), and Unlawful Possession of a Firearm and Ammunition in the District of Columbia by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 22 D.C. Code § 4503(a)(1), in Case No. 25-MJ-125.  His initial appearance was held on July 28, 2025.

On August 1, 2025, the Grand Jury returned an indictment, charging Defendant with (1) Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1); (2) Unlawful Possession of a Firearm and Ammunition in the District of Columbia by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 22 D.C. Code § 4503(a)(1); (3) Possession of a Prohibited Weapon (Ghost Gun), in violation of 22 D.C. Code § 4514; and (4) Unlawful Discarding a Firearm or Ammunition, in violation of 22 D.C. Code § 4503.04.

On March 17, 2026, Defendant pleaded guilty to Count 1 of the indictment—*i.e.*, Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).  Pursuant

to that plea agreement, the Government agreed to cap its allocution at the bottom of the Sentencing Guidelines.

**LEGAL STANDARD**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The recommended sentencing range from the Sentencing Guidelines will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

7

(i) issued by the Sentencing Commission . . .; and

(ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission . . . and

(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall*, 552 U.S. at 49. They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance

8

of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## GUIDELINES CALCULATION

The PSR calculates an adjusted offense level (*i.e.*, before acceptance of responsibility) of 14.   *See* PSR ¶¶ 15–21.

The Government submits that the 4-point enhancement should apply under USSG § 2K2.1(b)(4), which applies if "the defendant knew that any firearm involved in the offense was not otherwise marked with a serial number."   The firearm is an unbranded, non-descript P80 ghost gun.   From its appearance, it is obvious that it does not have a serial number such that Defendant would have known so.   Below are photos of the recovered firearm.





Second, the Government submits that the 2-point enhancement should apply under USSG § 3C1.2, which applies if the "defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." Here, Defendant discarded a loaded firearm in a residential area—specifically, someone's front yard. Below are screenshots of the recovery location.





Accordingly, the Government submits that an adjusted offense level of 20 applies.

Assuming that these enhancements apply, the Government submits that a 3-point deduction for acceptance of responsibility is warranted.[1]

### GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court impose a sentence at the bottom of the Sentencing Guidelines to a term of 30 months of incarceration,[2] followed by 3 years of supervised release, in light of the nature and seriousness of the offense, Defendant's history and characteristics, and the need for the sentence imposed to satisfy the statutory requirements set forth

---

[1] Assuming that Defendant has a total offense level of 17 and a Criminal History Score of III, *see* PSR ¶ 32, the applicable range is 30–37 months under the Sentencing Guidelines.

[2] This allocution assumes that the bottom of the Sentencing Guidelines is 30 months.

in § 3553(a)(2)(A)–(D).

### 1.  Nature, Circumstances, and Seriousness of the Offense

This factor strongly supports the Government's recommended sentence.   Defendant pleaded guilty to carrying a loaded firearm, which, for someone who was recently convicted of (and released for) a felony, is sufficiently dangerous to justify a significant sentence.   *See United States v. Blackson*, 2023 WL 1778194, at \*7, \*10 (D.D.C. 2023) ("Illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's pants, while out in public, poses an inherent risk of danger to the community. . . . The serious and violent nature of these prior convictions are probative of both defendant's capacity for and willingness to use firearms in a manner that poses a risk to others and the community.").

Not only did Defendant possess a firearm loaded with a round in the chamber, but he ran with it and discarded it directly outside of a residence, recklessly creating "a substantial risk of death or serious bodily injury to another person."   U.S.S.G. § 3C1.2; *see also United States v. Tasaki*, 501 F. App'x 441, 444-45 (6th Cir. 2013) (holding that the defendant's "reaching for the gun while the police pursued him and discarding it in a residential neighborhood created a substantial risk of serious bodily injury to the officer, and anyone potentially present or finding the firearm"); *United States v. Grate*, 81 F. App'x 451, 453 (4th Cir. 2003) ("[D]iscarding a weapon in a heavily trafficked area is also conduct creating a risk of serious bodily injury.").   That conduct, alone, also constitutes a separate offense under DC law.   *See* DC Code § 22-4503.04 ("It shall be unlawful for any person to knowingly discard, throw, or deposit any loaded or unloaded firearm or ammunition in a place other than the person's dwelling place, place of business, or on other land possessed by the person.").   Such conduct is so dangerous—and has been proven to be so

dangerous—that it is now a separate criminal offense. *See* D.C. Code § 22–4503.04 (Unlawful Discarding of Firearms and Ammunition). This conduct jeopardized the community, as anyone could have located that load firearm. Accordingly, the nature and circumstances of the offense strongly favors a significant sentence.

### 2. Defendant's History and Characteristics

Defendant's history and characteristics further support the Government's recommended sentence. Despite his young age of 23 years old, this offense is not the first time that Defendant has been convicted of a crime involving a firearm. His record reflects a disregard for lawful authority and a demonstrated willingness to endanger others to evade accountability.

At the time of the instant case, he was on supervised probation in two different cases in two different jurisdictions. First, in Superior Court Case No. 2024 CF2 000103, on January 2, 2024, Defendant attempted to possess with the intent to distribute a quantity of cocaine. Specifically, while MPD officers were on patrol, they observed Defendant standing with other people in the rear alley of 4500 Quarles Street NE. Officers made contact with Defendant and asked him about a large bulge in the front of his winter jacket. While Defendant began to take various items out of his front pockets, three loose rounds of 9mm ammunition fell from his pocket onto the ground. During a search incident to arrest, officers recovered nineteen small plastic capsules with varying amounts of white rock-like substance totaling 7.5 grams. The substance field-tested positive for cocaine base. Based on the number of plastic capsules, the amount was consistent with an intent to distribute the suspected cocaine and that the capsules containing white rock-like substance were not exclusively possessed for personal use. Officers also recovered from his person a clear vile containing an amber liquid emitting a smell consistent with liquid PCP.

14

Defendant was ultimately convicted of Attempted Possession of a Controlled Substance (Cocaine) and Unlawful Possession of Liquid PCP in September 2024; his supervised probation was scheduled to expire in September 2026.   According to the Pretrial Services Report, Defendant was not compliant with his supervision at the time of the instant offense.[3]

Defendant was also on probation in PG County in Case No. C-16-CR-23-003008.   In that case, PG County officers were responding to a report of a shooting when they saw a vehicle, which appeared similar to the lookout, committing multiple traffic infractions.   When officers attempted to conduct a traffic stop, the vehicle fled at a high rate of speed.   Eventually, the vehicle stopped and three subjects bailed out of it, leaving behind three firearms: a 9mm Glock firearm in the driver's seat, a 9mm Glock firearm with a switch attachment dropped by the front passenger, and a .45 caliber firearm dropped by the rear passenger.   All three subjects were detained shortly thereafter, including Defendant, who was the driver of the vehicle.   Officers then responded to the scene of the shooting, at which they observed multiple shell casings, shattered glass, and a bullet that had traveled into someone's home and was lodged in the sofa.   Defendant was convicted of the offense Loaded Handgun on Person in November 2024, and his supervised probation was scheduled to expire in November 2027.   According to a Pretrial Services Report, Defendant was not compliant with his supervision at the time of the instant offense.

In addition to his two prior convictions, Defendant had been arrested for a firearm on *two*

---

[3] Based on the Pretrial Services Report, Defendant was not present for home visits on June 20, June 23, June 24, and June 27, 2025.   CSOSA filed an Alleged Violation Report on June 24, 2025.   On June 26, July 8, and July 15, 2025, Defendant failed to report for drug testing. Defendant also failed to report by phone on multiple occasions.   Defendant reported for an office visit on July 2 and July 16, 2025.   According to the Pretrial Services Report, a probation show cause hearing was scheduled for July 29, 2025.   Defendant was ultimately held in that probation case, which was set to trail the instant case.

15

different occasions about a month before the instant offense. First, on June 9, 2025, at approximately 4:59 PM, MPD officers executed a residential search warrant at 1516 Kenilworth Avenue NE. At the time of entry, Defendant and another subject was stopped in the bedroom, and a third subject was stopped in the kitchen area. During the search, the officers recovered an AK-style pistol—specifically, a 7.62x39 Century Arms Mini Draco—from a cabinet under the kitchen sink/stove area. The pistol was loaded with one round in the chamber and fourteen rounds in a magazine that was capable of holding thirty rounds. Officers also recovered an AR-style pistol—specifically, a 5.56 caliber Aero Precision X15—from a backpack in the living room closest. The pistol had an obliterated serial number and was loaded with one round in the chamber and eleven rounds in a magazine that was capable of holding forty-five rounds. Defendant was arrested, but the Government ultimately declined to file any charges against him at the time.

About two weeks later, on June 23, 2025, at approximately 7:52 PM, MPD officers were in the 2900 Block of M Street NE when they observed a gray Volkswagen Jetta with Illinois Tags and no state registration sticker. Based on this observation, officers conducted a query of the tag, which revealed that the tag was expired. Officers then conducted a traffic stop of the vehicle, which was being driven by Defendant and occupied by an adult female (in the front-passenger seat) and a young child (in the backseat). After Defendant admitted that he was driving without a proper driver's permit, officers stepped him out of the vehicle. The adult female, who stated that she was owner of the vehicle, consented to a search of the vehicle. During that search, officers recovered a 9mm Glock 19 handgun, which was loaded with one round in the chamber and sixteen rounds in the magazine, in the female's purse, which had been sitting on the floorboard in the front-passenger seat area. When asked about the handgun, the female said it did not belong

16

to her, but Defendant claimed ownership of it.   A further query revealed that the handgun had been reported "stolen" in South Carolina.   Defendant was arrested for possession of the handgun, but the Government ultimately declined to file any charges against him at the time.[4]   Subsequent DNA testing confirmed that the four-person mixture profile from the magazine of the firearm was approximately 534 quintillion times more likely if the DNA originated from Defendant and three unknown, unrelated individuals than if the DNA originated from four unknown, unrelated individuals; in regard to the female, the DNA analyst concluded that there was limited supported to *exclude* her DNA from the profile.[5]

Moreover, at the time of his firearm arrest in the instant case on July 20, 2025, Defendant was subject to a court order prohibiting him from possessing, controlling, purchasing, or receiving any firearm or ammunition in Case No. 2025 CPO 001125.   The docket of that case indicates that on June 25, 2025, Defendant was present via Webex and a Civil Protection Order ("CPO") Consent Without Admissions was entered against him that specifically ordered Defendant not to possess any firearms or ammunition within the following two years.

Defendant has been given multiple opportunities to change course.   He was on close supervision at the time of the instant offense.   Yet each of these opportunities has been squandered. Instead of choosing a lawful path, Defendant armed himself with a gun once again, fled from police, and discarded the loaded gun in a residential area.   Defendant's history is a powerful indicator of his unwillingness to comply with the law and his repeated resort to extremely dangerous conduct.

---

[4] At the time of this arrest, an active temporary protection order prohibited Defendant from contact with that same adult female with whom he had been driving in Case No. 2025 CPO 001125. That order had been reextended on May 27, 2025, and it was set to expire on June 24, 2025.

[5] Both Defendant and the female were excluded as contributors to the profile obtained from the firearm.

This history weighs heavily in favor of a substantial sentence.

### 3.   Need for the Sentence Imposed

Defendant's sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense.   *See* 18 U.S.C. § 3553(a)(2).   Here, the Government's recommended sentence is sufficient, but no greater than necessary, to meet the goals of sentencing.

In this case, there is a compelling need to deter gun possession as a precipitator of violence—especially for those like Defendant who has already committed a prior offense involving a firearm.    This factor favors a significant sentence within the Sentencing Guidelines range.   Similarly, because of the needless danger caused by the related practice of discarding a loaded firearm in a residential area, a significant sentence is appropriate.    It has become too commonplace for defendants who illegally possess firearms to attempt to conceal their crime by running from police and discarding their firearms in a way that puts everyone around them at risk. A significant sentence here is needed to deter others from engaging in similar conduct, which poses a tremendous danger to the community.

Specific deterrence is equally vital here.   Defendant's last sentence was insufficient to deter him from possessing another gun.   And he committed this offense while still on probation and time of incarceration hanging over his head.   His conduct reflects a clear refusal to comply with the law, even after ample opportunity.   Only a significant sentence can deter him from repeating the kind of dangerous behavior that led to the events in this case.

### CONCLUSION

For the foregoing reasons, and pursuant to the parties' plea agreement, the Government

respectfully recommends that the Court impose a sentence at the bottom of the Sentencing Guidelines at 30 months of incarceration, followed by 3 years of supervised release.  Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:   */s/ Mark Levy*
Mark Levy
Assistant United States Attorney
D.C. Bar 241668
601 D Street NW
Washington, DC
(202) 252-7101
Mark.Levy@usdoj.gov